UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RONALD PODGURSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-11751 |
| | ) | |
| THE MASSACHUSETTS DEPARTMENT OF | ) | |
| CORRECTION, UMASS CORRECTIONAL HEALTH, | ) | |
| PROGRAM, SUPERINTENDENT JAMES SABA, | ) | |
| SUPERINTENDENT MICHAEL A. THOMPSON, | ) | |
| DR. A. HAMEED, and DR. PATRICIA RUZE, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

**Introduction**

Plaintiff Ronald Podgurski was in the custody of the Massachusetts Department

of Correction ("DOC") from July 2010 until his release in April 2012.  Defendants failed

to provide him with adequate medical care by refusing to provide effective treatment for

his diabetes and by ignoring the recommendation of healthcare professionals in treating

Mr. Podgurski's podiatric issues.  Due to this denial of proper medical treatment, Mr.

Podgurski underwent an emergency amputation of his fifth metatarsal joint.  Defendants

knowingly failed to fulfill their obligations to their patient.

**Parties**

1.      Plaintiff Ronald Podgurski is an individual who now resides in Stoughton,

Massachusetts.

2.      Defendant Massachusetts Department of Correction ("DOC") is a department of the Commonwealth of Massachusetts.

3.      Defendant UMass Correctional Health Program ("UMCH") is a program of UMass Medical School, which, pursuant to a contract with the DOC, is responsible for providing adequate medical care to all prisoners in DOC custody.  On information and belief, UMCH's principal place of business is UMass at 333 South Street, Shrewsbury, MA 01545.

4.      Defendant James Saba an individual, who, on information and belief, resides in the Commonwealth.  He is the Superintendent of the Massachusetts Correctional Institute, Cedar Junction at Walpole ("Walpole").  Suit against Defendant Saba is brought against him in his individual capacity.

5.      Defendant Saba's duties include, but are not limited to, the following: the administration and supervision of all personnel at Walpole; the care, custody and treatment of all Walpole inmates; the enforcement of rules and regulations issued by the Commissioner of Correction; and the provision of adequate medical care to the inmates of Walpole.

6.      Defendant Michael A. Thompson is an individual, who, on information and belief, resides in the Commonwealth.  He is the Superintendent of the Massachusetts Correctional Institute in Concord ("Concord").  Suit against Defendant Thomspon is brought against him in his individual capacity.

7.      Defendant Thompson's duties include, but are not limited to, the following: the administration and supervision of all personnel at Concord; the care, custody and treatment of all Concord inmates; the enforcement of rules and regulations

issued by the Commissioner of Correction; and the provision of adequate medical care to the inmates of Concord.

8.      Defendant Dr. A. Hameed is an individual who, on information and belief, resides in the Commonwealth.  She is the Medical Director at Walpole and an employee of UMCH.

9.      Defendant Hameed is responsible for ensuring that all prisoners at Walpole receive adequate medical care.  Dr. Hameed was responsible for treating Mr. Podgurski's medical conditions, obtaining records or information about Mr. Podgurski's pre-incarceration treatment, obtaining consultations with specialty providers, ensuring that those appointments take place, implementing any specialist recommendations, and issuing housing accommodations to patients like Mr. Podgurski.

10.      Defendant Dr. Patricia Ruze is an individual who, on information and belief, resides in the Commonwealth.  Defendant Ruze is the Medical Director at Concord and an employee of UMCH.

11.       Defendant Ruze is responsible for ensuring that all prisoners at Concord receive adequate medical care.  Dr. Ruze was responsible for treating Mr. Podgurski's medical conditions, obtaining records or information about Mr. Podgurski's pre-incarceration treatment, obtaining consultations with specialty providers, ensuring that those appointments take place, implementing any specialist recommendations, and issuing housing accommodations for patients like Mr. Podgurski.

**Facts**

12.      On or about July 23, 2010, Mr. Podgurski was convicted of offenses related to the possession of narcotics and placed in the custody of the DOC.  He was 67 years old at the time of his incarceration.

13.      At all relevant times, Mr. Podgurski was incarcerated in the custody of the DOC.

14.      At all relevant times, UMCH was the contractual medical provider for the DOC, having agreed to provide medical services to all persons incarcerated in DOC facilities.

15.      At the time Mr. Podgurski was incarcerated, he had a well- documented history of foot related problems, including neuropathy and callosity, which required regular visits to the podiatrist.  On the recommendation of his physicians, he received treatment from a podiatrist every month.  The podiatrist would, among other things, cut calluses off of his feet.  In addition, under the direction of his podiatrist, Mr. Podgurski would cut the calluses off of his feet by himself on a regular basis.

16.      The Defendants were on notice and aware of Mr. Podgurski's medical issues.

17.      In fact, upon Mr. Podgurski's incarceration, his daughter provided to Superintendent Saba a letter from his podiatrist explaining his need for regular podiatric treatment.  Superintendent Saba rebuffed the letters, and informed Mr. Podguski's daughter that he and the DOC would not follow the advice of any outside doctors, but would only listen to the advice of UMCH staff.

18.     Upon incarceration Dr. Hameed, in conjunction with the DOC, performed a physical exam of Mr. Podgurski.  On Mr. Podgurski's Physical Assessment form of July 27, 2010, the attending physician noted that Mr. Podgurski had been a diabetic for over twenty years, and was insulin dependent since 2000. This form also recognized many of Mr. Podgurski's long standing conditions such as his "dyslipidemia (high risk)," "pedal pulses," "foot calluses," "heart condition," "hypertension" and "arthritis."

19.     In conjunction with the Physical Assessment form, Dr. Hameed also completed and later reviewed a History and Screening form and a Chronic Disease Management form on July 27, 2010.  Despite being on notice of Mr. Podguski's serious serious foot issues, Dr. Hammeed subsequently failed to ensure the required podiatric care.

20.     For approximately his first 2 months of incarceration, Mr. Podgurski was housed at Walpole.  Mr. Podgurski immediately, and regularly thereafter, put in an official requested to see a podiatrist for treatment of his foot.  A nurse noted his request and told him that he would not be able to see a podiatrist for at least 2 months.  During that time a podiatrist in fact visited Walpole but did not perform treatment on Mr. Podgurski.

21.     Upon his incarceration, Mr. Podgurski had brought with him shoes properly fitted, and with extra padding to accommodate his calluses.  The DOC confiscated these size 12, 4E wide sneakers, saying that the white sneakers with a small dark trim were gang colored.  Instead they issued him the closest size sneakers they had from the privately run commissary, which, on information and belief, provides payments on all sales back to the DOC.  These sneakers were also white.  These sneakers were a

size 15 medium.  They did not fit, and had rubber knobs protruding into the foot cavity because the thin padding wore through quickly.  An official at another DOC facility subsequently allowed Mr. Podgurski to wear the shoes he had brought with him, showing there was, in fact, no actual security threat posed by the shoes.

22.    Both Mr. Podgurski and his daughter explained that he required proper shoes or he would develop severe issues with his feet.

23.    Despite his neuropathy, Mr. Podgurski received inappropriate footwear and inadequate podiatric care, which resulted in pain when walking.

24.    Mr. Podgurski constantly complained of foot pain and calluses caused by shoes the Defendant Saba and the DOC forced him to wear, and repeatedly requested podiatric shoes.

25.    Mr. Podgurski often had to walk with a cane, crutches or a walker.

26.    Mr. Podgurski suffered from swollen, red, callused and bleeding feet.  On several occasions his feet would discharge fluids.  Mr. Podgurski also suffered from recurring infections on his feet.

27.    After approximately five weeks without any podiatric care, Mr. Podgurski's feet became severally infected with what turned out to be gangrene.  He could not walk.  The rubber knobs in his prison shoes had worn through and felt like nails.  His right foot was bleeding profusely through the toilet paper and sock he put on it to slow the bleeding.

28.    Mr. Podgurski made numerous requests for appointments with a podiatrist in order to obtain medical attention.  Despite the fact that he could not walk without crutches, he was not allowed to see a doctor.

29.     Not until his calluses broke and were bleeding profusely did Dr. Hameed finally see him.  Mr. Podgurski wrapped toilet paper and a sock around the foot to try to slow the bleeding.

30.     Mr. Podgurski went to Dr. Hameed's office, and sat in the front of her desk.  Dr. Hameed sat at the chair behind her desk and said sarcastically, "Take your sock off and we'll see how serious this toe is."  All she did was have him take off the bloody sock and toilet paper.  She never got up from behind the desk, and never had him raise his foot so she could see the infection on the bottom of the foot.  She simply looked at the foot placed on the floor from behind her desk and then told him to put the sock back on and leave.  She performed no treatment whatsoever, and, failed to recognize that the foot had gangrene, and failed to prescribe antibiotics.

31.     Many nurses noted the seriousness of the foot condition to Mr. Podgurski and communicated that they regretted that they were not allowed to provide foot treatment.  The nurses soaked his foot in water to treat him the best they were allowed, noting that he needed to see a podiatrist, and that he needed antibiotics to treat what was later diagnosed as gangrene.

32.     On information and belief, Dr. Hameed is stationed at Walpole because of her history of malpractice and disdain for prisoner.  The facility is short term, so she is less likely to cause serious issues.

33.     In August 2010, Mr. Podgurski's foot issues began to escalate and the signs of infection, including bleeding, became more persistent.

34.     By September 2010, Mr. Podgurski's foot showed serious signs of gangrene with major discoloration.

35.     The Defendants still had not arranged for him to see a podiatrist.

36.     Finally, on September 14, 2010, Mr. Podgurski received a surgical consultation at Lemuel Shattuck Hospital.  He suffered from a blister with severe hematoma and infection on his right foot.  Doctors then opened and derided the blister and calluses on Mr. Podgurski's foot.  Doctors discovered that Mr. Podgurski's foot had hematoma and was gangrenous.

37.     Since Mr. Podgurski's right foot had become gangrenous, layers of tissue had to be surgically removed.

38.     Several months had now passed since his incarceration, and even following his hospitalization, Mr. Podgurski still was not allowed to see a podiatrist.

39.     Indeed, Mr. Podguski it was not until late September or early October 2010 that Mr. Podgurski was finally treated by a podiatrist.

40.     The podiatrist, Dr. King, was dismayed at the state of the foot.  He treated the foot as best he could, noted that Mr. Podgurski should have been receiving antibiotics, and requested that he be able to provide treatment to Mr. Podgurski, at least every month.

41.     The Defendants complied with this treatment plan for only two months. Thereafter, despite knowing the serious consequences of inadequate podiatric care (i.e. Mr. Podgurski's hospitalization), and the advice of the DOC's own podiatrist, the Defendants stopped the podiatric sessions, despite the fact that the podiatrist continued to visit the facility on at least a monthly basis for other patients.  Indeed, the podiatrist informed Mr. Podguski that he had repeatedly requested to treat Mr. Podguski, but was not allowed to do so.

42.     In November 2010, Mr. Podgurski was reassigned to Concord.  There he needed to walk a long distance to get to the prison's medical center, where he received his daily medicines.

43.     At the time of his transfer, Dr. Patricia Ruze, the Medical Director for MCI-Concord completed a Periodic Health Maintenance form, and a Chronic Disease Management form,

44.     Mr. Podgurski's foot issues continued from 2010 into 2011.

45.     During his incarceration at MCI-Concord, Mr. Podgurski developed a large, infected ulcer on his right foot after months of inadequate podiatric treatment.

46.     In February 2012, Mr. Podgurski reported that the pain in his foot worsened every day and that bleeding in his foot had increased.  He continued to request a podiatric boot for his foot, and continued in vain to request to see a podiatrist.

47.     On March 4, 2012, Mr. Podgurski was taken to Lemuel Shattuck Hospital due to his infected foot ulcer.  At this point Mr. Podgurski suffered from horrible pain, swelling, and draining of brown liquid from his foot.

48.     On March 6, 2012 Mr. Podgurski's foot ulcer had increased from 1 centimeter to 3 centimeters, with a white liquid drainage.

49.     On March 7, 2012, doctors surgically debrided and cleaned Mr. Podgurski's infected right food.  Due to signs of osteomyelitis, doctors suggested an MRI.  Not until days later, on March 16, 2012, did Mr. Podgurski received an MRI.

50.     On March 8, 2012 Mr. Podgurski's ulcer had grown to 4 centimeters and was draining a white liquid.

51.     The MRI confirmed that the infection had been allowed to go deep into his foot.  As a consequence, surgeons at Lemuel Shattuck Hospital debrided the skin and subcutaneous tissue on Mr. Podgurski's foot down to the bone and removed his entire fifth metatarsal joint.

52.     A photograph of Mr. Podgurski's foot after the surgery is attached as Exhibit A.

53.     After his surgery, Mr. Podgurski reported pain if he moved or walked.

54.     Mr. Podgurski's foot also experienced discoloration after his surgery.

55.     Although part of his foot had been removed, Mr. Podgurski's infections persisted.

56.     Antibiotics were administered intravenously for approximately six weeks to treat infection; a peripherally inserted central catheter, or PICC line, had to be inserted. Mr. Podgurski was then transferred to the Health Services Unit of the Souza-Barnowski Correctional Center where he remained until he got word on that his conviction had been overturned.

57.     Mr. Podgurski was released from the DOC's "care" directly from the prison medical center to Brockton hospital to continue to receive intravenous antibiotics.

58.     Even then, UMHC took 2 days to transfer his medical records, during which time Brockton Hospital could perform no procedures, including putting antibiotics into his PICC line.  The staff there was utterly dismayed at the treatment he had been provided.

59.     Since his incarceration, Mr. Podgurski has sought repeated treatment.  Mr. Podgurski continues to suffer from bloody drainage from his right foot, a decreased

sensation on his foot, constant palpating pulses and dystrophic, yellow and incurvated

nails.  Doctors predict long-lasting effects as a consequence of the depth of Mr.

Podgurski's initial essentially untreated infection.

60.     Because he does not have health insurance, Mr. Podguski has had to

personally pay for the medical treatment required to stem the damage done by the

Defendants.

## COUNT I

**CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION**
**(Against All Individual Defendants)**

61.     Mr. Podgurski incorporates all other paragraphs of this complaint.

62.     The individual Defendants violated the Eight Amendment through cruel

and unusual punishment towards Mr. Podgurski.

63.     The individual Defendants' acts and omission constituted deliberate

indifference to Mr. Podgurski's serious medical needs.

64.     The individual Defendants were aware that a substantial risk of harm

attended the lack of podiatric treatment, and nonetheless failed to provide such treatment.

65.     Mr. Podgurski was damaged.

## COUNT II
**VIOLATION OF ARTICLE 26 OF THE
MASSACHUSETTS DECLARATION OF RIGHTS**
**(Against All Individual Defendants)**

66.     Mr. Podgurski incorporates all other paragraphs of this complaint.

67.     The individual Defendants inflicted cruel and unusual punishment on Mr.

Podgurski.

68.     The individual Defendants' acts and omission constituted deliberate

indifference to Mr. Podgurski's serious medical needs.

69.     The individual Defendants were aware that a substantial risk of harm

attended the lack of podiatric treatment, and nonetheless failed to provide such treatment.

70.     Mr. Podgurski was damaged.

### COUNT III
### NEGLIGENCE/MEDICAL MALPRACTICE
**(Against the DOC, UMCH, and Dr. A. Hameed)**

71.     Mr. Podgurski incorporates all other paragraphs of this complaint.

72.     The DOC, UMHC, and Dr. A. Hameed owed Mr. Podgurski a duty of

care.

73.     The DOC and UMHC are vicariously liable for the acts and omissions of

their employees.

74.     The personnel of the DOC and UMHC, including Dr. Hameed, breached

their duty, deviated from the standard of care, and thus caused harm to Mr. Podgurski.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant him the following relief:

1.     Issue a judgment against Defendants declaring that their acts, omissions,

policies, and practices with regard to the medical treatment of Mr. Podgurski amount to

cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to

the United States Constitution, and the Massachusetts Declaration of Rights.

2.     Issue a judgment against Defendants declaring that their acts, omissions,

policies, and practices with regard to the medical treatment of Mr. Podgurski amount to

negligence and/or medical malpractice;

3.     Award compensatory and punitive damages to Mr. Podgurski;

4.     Award Mr. Podgurski reasonable attorneys' fees and costs, in accordance

with 42 U.S.C. § 1988 and other applicable law; and

5.     Grant such other and further relief as this Court considers just and proper.

**JURY DEMAND**

Mr. Podgurski demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: July 22, 2013

RONALD PODGURSKI,
By his attorney,

/s/ Josh Gardner
Josh Gardner (BBO#657347)
Josh Gardner Law, P.C.
33 Mount Vernon St.
Boston, MA 02108
Tel: 857-225-2743
josh@joshgardnerlaw.com